## CAR FLOAT NO. 4.

### (District Court, S. D. New York. October 26, 1898.)

1. TUG AND TOW—TOW IN CONTROL OF NAVIGATION.

The steamer C. in coming to her wharf under her own steam and in charge of her pilot, but with the assistance of several tugs, pressed against Float No. 4 in a high wind, so as to cause the float to break away partly from her mooring; *held* that the tug R.. one of the helpers, was not liable for the consequent damage, it not appearing that the R. was chargeable with any independent act of negligence of her own, but was acting wholly under the direction of the steamer and her pilot.

2. SAME—DUTY TO CARRY SPARE LINES.

It further appearing that after the tug had partly broken loose, she was held by one line for a considerable time, and might have been held fast had other spare lines been on board to make good the broken ones, *held* that the float was also in fault for not having spare lines, and was therefore liable for the subsequent damage done by her breaking completely adrift.

Peter S. Carter, for libelant.

Wilcox, Adams & Green, for Erie R. Co.

James J. Macklin, for the Raymond.

BROWN, District Judge. The above libel was filed to recover for the damages caused on the 3d of April, 1896, to the libelant's canal boat Corner Stone, which was laid up for the winter in Erie Basin, and was injured by Car Float No. 4, belonging to the New York, Lake Erie & Western Railroad Company, which had broken adrift in a high wind and come down upon the libelant's boat. The tug C. P. Raymond was made a party defendant under the fifty-ninth rule, upon the allegation that the tug C. P. Raymond was solely in fault for the collision, inasmuch as that tug having in tow the steamship Cacique, in bringing her into the basin negligently caused her to strike the port side of the float as the latter was moored at the end of the Raymond street pier, and to break loose, in consequence of which the injury to the libelant's barge occurred.

The evidence shows that the Cacique came into the basin under her own steam for the purpose of mooring upon the northerly side of the wharf, at the end of which No. 4 lay moored, and that the steamship was assisted by three tugs, of which the Raymond was one; that her navigation was still in charge of the pilot who had been in control of her navigation, to whose orders the tugs were subject. The float at each end projected beyond the sides of the wharf. As the Cacique came in, her pilot caused her to approach the float for the purpose of requesting the float to move further to the southward, so as not to overlap the side of the pier where the

steamship was to moor. There was a high wind from the north-west; and upon the contradictory evidence, taking all the circumstances into account, I am of the opinion that the steamship did probably drift against the car float, so that with the added force of the contact of the steamship and her pressure against the side of the float while subject to the northwest wind, which was nearly astern, the mooring line by which the float was moored to the wharf gave way, so that the float, after the steamship had backed out for the purpose of going to the northerly side of the wharf, swung outward and subsequently parted her forward line so as to be completely adrift.

I am satisfied, however, that the weight of evidence is against the contention of the float that the tug Raymond was on the steamer's port side, that is, the side towards the float as the steamer approached her, but that the Raymond on the contrary was on the starboard side at that time and did not come in contact with the float. There is no evidence, therefore, that indicates in the least any negligence or failure of duty on the part of the pilot of the Raymond in the performance of anything with which he was charged. Upon the evidence at this hearing it must be found that the ship, which had come in under her own steam and in charge of her own pilot, was the principal, and that the tugs were only subordinate assistants; and that the ship would be alone responsible for any damaging contact with the float, unless some distinctly faulty conduct of some one of the captains of the tugs outside of the pilot's management was shown to have contributed to the loss. Here there is no such evidence as respects this tug; and the other helping tugs and the steamship herself have not been made parties. As respects the Raymond, therefore, the libel must be dismissed.

The only remaining question is whether the float, supposing that she broke loose in consequence of the impact of the steamer, should nevertheless be held in fault. I do not find that any blame is to be attached to her for mooring where she did, or in respect to the lines by which she was made fast. Both lines were in good order and of the usual strength; and her breaking away is naturally accounted for by the contact and pressure of the steamship in a very high wind. It appears, however, that after her stern had swung out it moved around considerably to the southward, and that the float was still held by the other line while she swung against a vessel moored on the southerly side of the same wharf; that she remained in that position for some little time; that the man in charge of the float made no effort to secure her further than she was already held by the single line attached to her, and that no other line was on board the float, by which he could have added to her security if he had sought to do so. It is urged that the lack of any spare line for such a purpose was a failure in the reasonable equipment of the float for emergencies, such as to make the float liable for subsequently breaking away; and that there was abundant time and opportunity to have increased her fastening by added lines had any such lines been aboard, and that this would have prevented the subsequent damage. After consideration, I feel con-

strained to sustain this contention in view of the constant emergencies arising in navigation, and the ordinary practice from time immemorial to have spare lines on board to meet them. The mere fact that similar floats have not been in the habit of carrying any spare lines, cannot be admitted as a defense, or as dispensing with the requirements of reasonable prudence so long understood and recognized in navigation.

Decree for the libelant with costs against the float, and in favor of the tug Raymond.